******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* TRAVIS LANIER
## (AC 43671)

Bright, C. J., and Moll and Bear, Js.

*Syllabus*

Convicted of the crime of burglary in the second degree in connection with a confrontation in the victim's apartment, the defendant appealed to this court, claiming, inter alia, that his constitutional rights to confrontation and to present a defense were violated when the trial court precluded him from cross-examining the victim about matters pertaining to the victim's bias against him and motive to falsify his claims to the police. The victim, the defendant and M had been at a bar when the defendant asked the victim if he could borrow twenty dollars. The victim gave the defendant the money and stated that he had other money at home for his rent. When the bar closed, the defendant invited the victim to his apartment, where he and M punched the victim and asked him about a watch he allegedly had stolen from M. The men then went to the victim's apartment, where the defendant took $400 and threatened to shoot the victim if he talked to the police. The state charged the defendant with six crimes, including burglary in the second degree by entering or remaining unlawfully in the victim's apartment with the intent to commit any, some or all of the underlying crimes of robbery in the first degree, robbery in the second degree, threatening in the second degree in violation of statute (§ 53a-62 (a) (1)) and larceny in the sixth degree. Prior to trial, the defendant filed a motion in limine seeking to impeach the victim's credibility with evidence of his felony conviction of driving while under the influence of intoxicating liquor or drugs, which had occurred prior to the incident with the defendant and M, and for which the victim was serving a sentence of probation both at the time of the incident with the defendant and M and at the time of trial. The defendant claimed, inter alia, that there would likely be testimony that the victim's conduct during the incident with the defendant and M violated the terms of the victim's probation, and that such evidence was relevant to the victim's state of mind during the incident and motive to fabricate claims against the defendant. The defendant also sought to question the victim about a violation of the victim's probation that occurred prior to the pendency of this case, asserting that, because the victim had not been incarcerated as a result of that violation, he had an interest in staying in the state's good graces, which was relevant to his veracity and motive to falsify claims against the defendant. The defendant further contended that, because M claimed that the victim had stolen his watch, the victim would have a motive to fabricate his allegations against the defendant if he knew that a condition of his probation was that he not have any new arrests. The trial court denied the defendant's motion but permitted him to question the victim regarding his felony conviction, the name of the crime of which he had been convicted and the fact that he was on probation as a result of that conviction at the time of the incident with the defendant and M and at the time of trial. *Held*:

1. The trial court did not impermissibly infringe on the defendant's constitutional rights to confrontation or to present a defense and did not abuse its discretion in limiting his cross-examination of the victim: although the court did not explicitly find that the defendant's proffered line of questioning was irrelevant, it determined that it was speculative and that its probative value was outweighed by its prejudicial effect, the issues related to the victim's probationary status, which the court excluded, were marginally related, at best, to the issues in the case, and the defendant failed to provide a sufficient foundation to support his claim that his proffered line of questioning related to the victim's motive to fabricate the allegations against him, as it strained credulity to believe that the victim would initiate contact with the police if he was worried that they would learn he had been drinking alcohol or that the defendant and M would accuse him of larceny as to M's watch; moreover, the defendant's attempt to characterize his proffered line of questioning as

relating to the victim's state of mind was tenuous and did not change its speculative nature, this court having previously determined that speculative evidence is irrelevant; furthermore, defense counsel undertook an extensive and robust cross-examination of the victim that addressed many inconsistencies in his testimony, and the jury found the defendant not guilty of five of the six charges against him, which indicated that it did not credit all of the victim's testimony.

2. The defendant could not prevail on his unpreserved claim that the trial court's jury instruction on burglary in the second degree misled the jury because the court did not define the terms "physical threat" and "imminent" as elements of the underlying crime of threatening in the second degree:

a. The defendant was not entitled to review of his claim pursuant to *State* v. *Golding* (213 Conn. 233), as it was clear from the record that, under *State* v. *Kitchens* (299 Conn. 447), he implicitly waived his right to challenge the trial court's instructions on appeal; defense counsel had a meaningful opportunity to review, comment on and suggest modifications to the court's proposed instructions, she affirmatively accepted the instructions as proposed by repeatedly telling the court that she had no other issues to raise concerning the instructions, the proposed instructions were provided to defense counsel six days prior to when the jury was charged, defense counsel had the opportunity, overnight, to review the final jury instructions as modified from the charging conference with the court, and at no time before or after the final charge did defense counsel raise any issue or objection concerning the instructions as they related to the underlying crime of threatening.

b. The defendant's assertion that the state failed to provide an adequate record to show that he waived his instructional claim was unavailing: although the record did not contain a copy of the trial court's proposed jury charge, which had not been made an exhibit at trial, and despite the defendant's contention that there was not enough evidence to determine what was in the draft of the court's proposed instructions, the record was adequate for this court to closely examine the particular facts and circumstances and to make a determination as to whether the defendant had implicitly waived his right to challenge the instructions on appeal, as the trial court had held an on-the-record charging conference in which it addressed each jury instruction the parties requested, and gave the parties multiple opportunities to comment on them and on the court's proposed instructions; moreover, the waiver rule in *Kitchens* did not require that a copy of the proposed instructions be marked as an exhibit but, rather, only evidence that the court gave the parties a copy of the proposed instructions, and that the reviewing court's determination of implied waiver be based on a close examination of the record and the particular facts and circumstances of the case.

c. Contrary to the defendant's alternative claim, the trial court did not commit plain error when it failed to include the definitions of "physical threat" and "imminent" in its jury charge relating to the underlying crime of threatening in the second degree, as this court previously has determined that a "threat," consistent with its dictionary definition, is an expression of intent to cause future harm, and the defendant did not demonstrate that "imminent," as used in § 53a-62, has anything other than its ordinary meaning: because the jury returned a general verdict on the burglary charge, it was unknown whether the verdict was based on the underlying crime of threatening or the underlying crime of larceny in the sixth degree, any error in the court's instructions on threatening was harmless beyond a reasonable doubt, as the evidence was sufficient to support the defendant's conviction of burglary on the basis of the underlying crime of larceny, which the defendant conceded in his appellate brief, the defendant did not raise any challenge to the jury instructions, and he did not show that the verdict was based on a legally inadequate underlying theory of conduct on his part or allege that the court misstated the law, that the state's theory of conviction was time barred or that his actions were constitutionally protected.

Argued March 9—officially released July 6, 2021

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of conspiracy to commit robbery in the first degree, conspiracy to com-

mit robbery in the second degree, robbery in the first degree, robbery in the second degree, assault in the second degree and burglary in the second degree, and, in the second part, with being a persistent felony offender, brought to the Superior Court in the judicial district of Middlesex, where the court, *Suarez*, *J.*, denied the defendant's motion to admit certain evidence; thereafter, the first part of the information was tried to the jury; verdict of guilty of burglary in the second degree; subsequently, the defendant was tried to the court on the second part of the information; finding of guilty; thereafter, the court rendered judgment in accordance with the verdict and the finding, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Michael A. Gailor*, state's attorney, and *Russell C. Zentner*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Travis Lanier, appeals from the judgment of conviction, rendered following a jury trial, of burglary in the second degree in violation of General Statutes § 53a-102 (a). He claims that (1) the trial court violated his constitutional rights to confrontation and to present a defense when it precluded him from cross-examining the victim regarding matters that allegedly concerned the victim's bias against the defendant and motive to falsify his claims to the police regarding the defendant, and (2) the court's jury instruction on burglary in the second degree misled the jury because it did not define the elements of threatening in the second degree, which was one of the alleged underlying crimes for the burglary charge.[1] We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of January 28, 2018, at about 11 p.m., after the victim, Alejandro Marrinan, had finished working, he went to a local bar in Middletown called the Corner Pocket. While at the bar, he encountered the defendant, whom he had met on previous occasions at the bar and who went by the name "Taz." The defendant was at the bar with two other individuals, a man named Mason Moniz and Moniz' mother. At some point, the defendant bought the victim a drink, and the two had a conversation. The defendant asked to borrow twenty dollars from the victim, who gave him the money and stated, "I have my other money at home for my rent."[2] The victim testified that he stayed at the bar with the defendant until the bar closed at 1 a.m., at which time the defendant invited the victim and Moniz to his apartment. Before they left the bar, they bought beer to bring to the apartment.

At the defendant's apartment, when the victim was taking off his jacket, he turned around and was punched in the face by the defendant and "knocked out." The victim testified that he was "out cold" or unconscious for about thirty seconds, and that he remembered the defendant picking him up and hitting him again, this time in the mouth. Thereafter, he also was hit by Moniz. At that time, the defendant and Moniz asked the victim about a watch,[3] and stated that they were going to go to the victim's apartment to get his money or they were going to hurt him.

While the three men walked to the victim's apartment, which was on Main Street in Middletown, the victim walked slowly because he had dialed 911 on his cell phone, which was in his pocket, and hoped that the call would alert the police to his location. The victim testified that, during that time, the defendant and Moniz walked behind him and pushed him. When they arrived at the victim's apartment, the defendant was very angry and demanded that the victim open the door. The victim

testified that the defendant and Moniz forced him to go inside his apartment, and, once inside, the defendant said, "give me the money, where's the money?" The victim kept his money in a bank envelope in a bedroom closet, with $400 folded in the envelope and $400 the long way in the envelope. When the victim took the envelope out of the closet, the defendant grabbed the envelope, took the money and left the room, stating that he would shoot or hurt the victim if the victim talked to the police. Although the envelope contained $800, the victim testified that the defendant took only $400. The defendant and Moniz then left the apartment, and the victim called 911 again. This time, the victim spoke to a 911 operator and stated that two people had just robbed him, that the two individuals were walking down the street, and that he was scared for his life because one of the robbers had threatened to shoot him if he talked to the police. During that call, the victim also stated that he had been hanging out with friends when the incident occurred and that, after the defendant took his money, the defendant asked if the victim wanted to go back to the defendant's apartment.

Officer Kyle Pixley of the Middletown Police Department was working a late shift on the evening of January 28, 2018, into the morning of January 29, 2018, when he received a call at 2:47 a.m. from police dispatch to go to the north end of Main Street to canvass the area for two suspects involved in an armed robbery. Once there, he saw two individuals who matched the descriptions of the suspects walking northbound on the sidewalk on the east side of Main Street, just south of Rapallo Avenue, and they were the only two people on Main Street at that time. He drove his police cruiser alongside the suspects, stopped, got out, and asked them to show him their hands. The men ignored the officer and continued to walk in a northbound direction, at which point the officer drew his pistol and asked several more times for them to comply. Moniz stopped, raised his hands, and "froze," while the defendant kept walking and rounded the corner onto Rapallo Avenue, out of Officer Pixley's sight. At that time, Officer Jeffrey Scoppetto of the Middletown Police Department had arrived at the corner of Main Street and Rapallo Avenue, stopped his police cruiser on Rapallo Avenue, got out of his vehicle, and approached the defendant, who was walking in an easterly direction on Rapallo Avenue. Initially, the defendant did not comply with the requests of either officer to come back, but he eventually walked back toward Officer Pixley. After the defendant and Moniz were handcuffed, Officer Pixley walked around the corner onto Rapallo Avenue to see if the defendant had discarded a weapon or other evidence, and he found two 100 dollar bills lying on the sidewalk, which were taken and tagged as evidence. Two 50 dollar bills were taken from Moniz and also tagged as evidence.

In response to the victim's second 911 call concern-

ing a robbery, Sergeant Nicholas Puorro and Officer Michael Pellegrini of the Middletown Police Department went to the victim's apartment, where they interviewed the victim. Sergeant Puorro observed that the victim was "shaken up," nervous, and scared, and had visible injuries about his face. Thereafter, Officer Pellegrini took the victim in his police cruiser to the area of Main Street and Rapallo Avenue, where the defendant and Moniz had been detained on the sidewalk. Officer Pellegrini asked the victim to identify the two suspects, and he did so "[i]mmediately" and "[w]ithout hesitation." After the identifications were made by the victim, which occurred at 3:20 a.m., he was taken back to his apartment, and he subsequently was transported by ambulance to a hospital after complaining to Officer Pellegrini about a head injury. The victim told staff at the emergency department of the hospital that he thought he might have been drugged. Matthew Dolan, an emergency medical doctor, saw the victim in the early morning of January 29, 2018, and ordered certain tests because the victim had signs of blunt trauma to his face. The results of those tests indicated that the victim's nose was broken.

The defendant was arrested and charged in a third substitute information with having committed the following crimes: in count one, conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (1); in count two, conspiracy to commit robbery in the second degree in violation of General Statutes §§ 53a-48 (a) and 53a-135 (a) (1) (A); in count three, robbery in the first degree in violation of § 53a-134 (a) (1); in count four, robbery in the second degree in violation of § 53a-135 (a) (1) (A); in count five, assault in the second degree in violation of General Statutes § 53a-60 (a) (1); and in count six, burglary in the second degree in violation of § 53a-102 (a). Specifically, in count six, the state alleged that the defendant committed burglary in the second degree by entering or remaining unlawfully in the victim's apartment sometime between 1 and 2:50 a.m. on January 29, 2018, while the victim was present, with the intent to commit a crime therein, namely, robbery in the first degree as alleged in count three, and/or robbery in the second degree as alleged in count four, and/or threatening in the second degree in violation of General Statutes § 53a-62 (a) (1), and/or larceny in the sixth degree in violation of General Statutes § 53a-125b (a). The defendant also was charged in a part B information with being a persistent felony offender in violation of General Statutes § 53a-40 (g) as a result of his two prior convictions in 2006 and 2000 of possession of narcotics in violation of General Statutes § 21a-279 (a).

Following a jury trial, the jury found the defendant guilty of burglary in the second degree as alleged in count six and not guilty of the charges in counts one through five. Thereafter, on June 7, 2019, a trial was

held before the court with respect to the part B information, and the defendant was found guilty and adjudicated to be a persistent felony offender. The court thereafter sentenced the defendant on count six to seven years of incarceration, followed by three years of special parole with special conditions. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim is that the court violated his constitutional rights to confrontation and to present a defense when it prevented him from cross-examining the victim about matters that he claimed were highly relevant to the victim's bias against the defendant and motive to falsify his claims to the police. We disagree.

The following additional facts are relevant to this claim. On April 26, 2019, prior to the commencement of trial, the defendant filed a motion in limine, requesting "that the court allow him to impeach the [victim's] credibility with evidence of the [victim's] felony conviction and to confront him with certain conduct, while on probation, which [was] probative of his lack of veracity." Specifically, the victim had been convicted in 2017 of the felony of operating a motor vehicle while under the influence of intoxicating liquor or drugs, and, at the time of the incident underlying the criminal charges against the defendant, the victim was serving a period of probation in connection with that conviction. In his motion, the defendant stated that he was seeking to cross-examine the victim, a key witness for the state, "on evidence of prior crimes, as well as the status, standard conditions, and special conditions of the probationary period that he is currently serving, in addition to the facts and circumstances surrounding his conviction, the original sentence and the sentence following a violation of probation.

"In this case, where there is suspended prison time hanging over the [victim], the fact that a jury might reasonably contemplate that a person in such a situation might have a tendency to wish to curry favor with the prosecuting authorities is a legitimate [ground] of cross-examination. Secondly, where there will likely be testimony from the [victim] and other witnesses that [the victim's] conduct at the time of the alleged incident [violated] the terms and conditions of his probation, [such evidence], at [a] minimum, goes to the state of mind of the [victim], and certainly towards the [victim's] motive to fabricate. As such, these are matters properly considered by a jury. . . . These facts are different from mere impeachment as a result of prior criminal convictions and go directly towards the jury's ability to weigh the credibility of the [victim]." (Citation omitted.)

In his motion, the defendant acknowledged that the victim's felony conviction did not involve a crime that

necessarily related to the victim's credibility but argued that the court should balance the probative value of the evidence against its prejudicial effect. According to the defendant, the fact that the victim previously had been convicted of a crime that did not directly reflect on his credibility did not bar admission of evidence of that conviction, as the jury could simply afford less weight to the evidence if it chose to do so.

On May 10, 2019, the court held a hearing on the defendant's motion in limine. At the hearing, defense counsel stated that she wanted to ask the victim about the fact that the victim previously had violated his probation, although that violation did not occur during the pendency of this case.[4] Specifically, defense counsel argued that, because the victim previously had violated his probation and was not incarcerated as a result of that violation, he had an interest in making sure that he stayed "in the state's good graces . . . ." Defense counsel stated: "That certainly goes to any motive to fabricate, also veracity. We do have the fact that he is being accused throughout these allegations of larceny. He has recently—again, he has experienced the effect of being arrested while on probation and having the risk of going back to jail three weeks before, and he did not. So, certainly he is on notice that, if it happens again, which could have happened if—if he had been reported for this larceny, that he could have violated again shortly—in very short succession, and my guess is, the state would not have looked quite as kindly on him for the second violation." The court responded, stating, "[t]hat's all too speculative. That's way too speculative. There are many reasons why somebody can get violated [on] probation. It's way too speculative."

In an oral decision, the court denied the defendant's motion in limine, stating: "So, first of all, our courts have held that the sixth amendment right to compulsory process is limited by controverting public interest and the rules of evidence. The constitution does not require that a defendant be permitted to present every piece of evidence he wishes. The trial court retains the power to rule on admissibility of evidence pursuant to traditional evidentiary standards.

"In Connecticut, we have a Code of Evidence, which specifically addresses the issue of prior convictions. Section 6-7 . . . states that '[f]or the purpose of impeaching the credibility of a witness, evidence that a witness has been convicted of a crime is admissible if the crime was punishable by imprisonment of more than one year. In determining whether to admit evidence of a conviction, the court shall consider the extent of the prejudice likely to arise, the significance of the particular crime in indicating untruthfulness, and the remoteness in time of the conviction.'

"Before the court are requests to allow the defendant to cross-examine the [victim] on his [operating a motor

vehicle while under the influence] conviction and a violation of that probation. The violation of that probation arose as a result of an action prior to the incident here in question. The [victim] remains on probation.

"Of course, every cross-examination based on a conviction has, in itself, a degree of prejudice. To this court, the question really is what's the probative value? Having considered the prejudice and the probative value of what's being requested, the court will order as follows. The defendant may inquire of the [victim] of a prior felony conviction, and the defendant may inquire as to whether or not he is currently on probation. Any inquiry as to whether or not he violated that probation, [or the] basis of the violation of that probation, the court finds that its probative value is outweighed by its [prejudice]. Therefore, the court is going to limit the inquiry as to those two areas."

On direct examination by the state, the victim acknowledged that he had a prior felony conviction in 2017 for operating a motor vehicle while under the influence of intoxicating liquor or drugs. He also testified that he was on probation for that offense. Before the commencement of cross-examination, the state made an oral motion in limine to preclude the defendant from asking the victim about whether the victim thought that his consumption of alcohol on the night in question could result in a violation of a condition of his probation. In response, defense counsel asked the court that she be able to question the victim about his consumption of alcohol on the night in question. The following colloquy transpired:

"[Defense Counsel]: . . . It may not—based on the state's representation, even though [the victim's consumption of alcohol] may not be a technical violation [of his probation], it could change the conditions of his current probation. If he had finished substance abuse treatment and his probation officer learned that he was now consuming excess amounts of alcohol, then the probation officer could potentially change those conditions, require him to go back into treatment. That may be something that the [victim] would wish to avoid and, because of that, he may not want the probation officer to get information about what had happened that night, the fact that he was consuming potentially excess amounts of alcohol, that he was intoxicated, as he represented in the emergency room. And for those reasons, the defense believes that probing into that line of questioning is relevant to his motive to fabricate, his veracity, and we believe that we should be able to have that opportunity to question him.

"The Court: Well, isn't that speculative, whether or not the probation officer may or may not use this to violate his probation? He hasn't done it yet.

"[Defense Counsel]: Well, it is in the mind of the

[victim], whether he has those concerns, we should be able to ask him about, because that may lead him to have a motive to fabricate. So, he may speculate, but that is something that we should be able to question him about. Did he have those concerns?

"[The Court]: No. But isn't that speculation on your part? I mean, you're assuming that the probation officer may violate him if he—if he drank alcohol.

"[Defense Counsel]: I'm not—I'm not assuming that the probation officer would violate him if he drank alcohol. What we would want to question the witness about is whether or not he knew that one of the conditions of his probation was substance abuse treatment and whether he knew that, potentially, the knowledge of him being intoxicated on that night or drinking excessive amounts of alcohol while he's on probation for a felony [conviction of operating a motor vehicle while under the influence] could potentially change those conditions of his probation.

"I'm not speculating as to whether it would, but we believe that being able to question him about his thoughts on that, whether he knew those [conditions] of his probation is relevant and necessary in order to delve into his motive to fabricate and his veracity.

"The Court: Okay.

"[Defense Counsel]: And bias, for that matter. Thank you.

"[The Prosecutor]: Your Honor, I would direct the court's attention to § 6-6 of the Connecticut Code of Evidence, subsection (b), on specific instances of conduct where it says [the] general rule, where it's codified that a witness may be asked, in good faith, about specific instances of conduct of the witness, if probative of the witness' character for truthfulness. The fact that he consumed alcohol is not something that would be probative of his truthfulness. . . .

"[Defense Counsel]: Your Honor, just in response, the defense filed a motion specifically delving into this area regarding the [victim's] state of mind. The court has made a ruling regarding our questioning of him on probation, the fact that he was on probation at the time, the fact that he's on probation now, the fact that he has that felony conviction for [operating a motor vehicle while under the influence]. This goes specifically to his state of mind at the time and is particularly relevant to show motive, bias, or interest, and there is case law in Connecticut that any evidence tending to show motive, bias, or interest of an important witness is never collateral or irrelevant.

"We should be able to question him about that, about his state of mind at the time and whether or not he may have had an interest at the time, knowing that he was on probation and that this event did happen. We

should be able to question him about that in order to determine what his state of mind was at the time and if he had any motive, bias, or interest at that time. . . .

"The Court: Are you familiar with § 6-7 of the [Connecticut Code of Evidence]? . . .

"[Defense Counsel]: Yes.

"The Court: And it talks, as a general rule, of impeaching the credibility of a witness, evidence that a witness has been convicted of a crime is admissible if the crime was punishable by imprisonment for more than one year. In determining whether to admit evidence of a conviction, the court shall consider the extent of the prejudice likely to arise, the significance of the particular crime indicating untruthfulness, and the remoteness in time of the conviction.

"There are several cases that talk about what types of crimes may be admitted for untruthfulness, lack of veracity. And the [Connecticut] Code [of Evidence] still leaves it to the discretion of the court as to whether or not to admit it or not, and the court has to impose a balancing act, probative value versus prejudicial [effect].

"Now, I allowed you yesterday, or whenever we heard the motion, to ask questions as to his conviction of a felony [for operating a motor vehicle while under the influence]. I'm not sure that [such] a felony [conviction] goes toward veracity. It's not a crime of larceny. It's not a crime of fraud or things of that sort. It's a felony. So, I allowed you to question him on that basis, and I went beyond that and allow[ed] you to ask whether or not he's on probation for that.

"The [Connecticut] Code [of Evidence] limits the subject matter of proof to the introduction that the witness has been convicted of a crime. The court shall limit the crime by its name and when and where the conviction was rendered. Except that the court may exclude evidence of the name of the crime and, if the witness denies the conviction, the court may permit evidence of the punishment imposed. That's if the victim . . . denies the conviction.

"I think I—I think I've granted you extra latitude by allowing you to inquire as to whether or not he's on probation. But whether or not he's going to be violated for his probation, this incident occurred a year ago, a year and a half ago. Whether or not he's going to be violated or not I think goes beyond that scope.

"[Defense Counsel]: Your Honor, if I may just respond? The court did make a ruling regarding the defense being able to question the [victim] about being on probation at the time and also being on probation today.

"The Court: Right.

"[Defense Counsel]: That is a separate matter from whether or not he has a felony conviction that goes directly towards veracity. The court also ruled that we could discuss the fact that he has a felony conviction. In fact, the state already elicited that information from the [victim].

"The Court: Right.

"[Defense Counsel]: And the state also elicited the information regarding the [victim] being on probation. The questions that the defense is seeking or may seek to ask the [victim] [do] not go to whether or not he was on probation but whether his state of mind at the time could have been affected by the knowledge that being on probation and being intoxicated at the time could give him some motive, interest, or bias to fabricate. . . . Now, the defense should be able to cross-examine this [victim] regarding whether he had any motive, interest, bias, or prejudice based on the knowledge that, because he was being monitored and because this incident happened and if his probation officer found out about that, it could change the conditions of his probation. It could have a number of consequences and I'm not—

"The Court: But that's all speculative.

* * *

"The Court: Like I said to you when I issued the decision, the sixth amendment is not unlimited. It does still have to—there are rules of evidence that allow some and exclude other testimony. Anything else?

"[Defense Counsel]: Your Honor, just to conclude, the defense believes that [the defendant's] sixth amendment right to fully cross-examine this [victim] should allow him to fully delve into areas of motive, interest, bias, or prejudice as a matter of right in order to determine whether this [victim] did have any ulterior motives to fabricate, what his state of mind was at the time, and being able to cross-examine this witness against [the defendant] is a fundamental right in [the defendant's] trial. Any—we believe that any limit on that ability to cross-examine would affect his due process rights.

"The Court: Well, all right. Well, okay. Thank you for that. The court's decision is that you can inquire as to the crime, which is the [operating a motor vehicle while under the influence] felony conviction. By the way, I think the court is being even generous by allowing you to name the crime. And the fact that he's on probation. I think that the court's already gone beyond the—beyond that which is permitted by the [Connecticut] Code [of Evidence]. I'm going to find that asking questions with respect to any potential violation of his probation is so speculative that the probative value is outweighed by any—by the prejudicial value of it. . . .

"[Defense Counsel]: Just to clarify. Is the defense allowed to discuss the probation conditions of his probation?

"The Court: No. You can ask that he had a felony conviction. You can ask that it's for [operating a motor vehicle while under the influence]. You can ask that he's on probation for it."

When defense counsel also asked the court if it was permissible to ask the victim whether one of the standard conditions of his probation was not to be arrested, the state objected on the ground of relevance, and the court asked, "[h]ow is that relevant?" Defense counsel explained that it was relevant "to delve into the [victim's] state of mind and motive to fabricate," given the allegation against the victim that he stole Moniz' watch. See footnote 3 of this opinion. According to the defense, if the victim knew that one of the standard conditions of his probation was not to have any new arrests, and he was being accused of a larceny involving the theft of a watch, that might have given him a motive to fabricate his allegations against the defendant. The court did not agree and limited cross-examination to the victim's felony conviction and whether he was on probation at the time of the incident and at trial. The court explained: "Now, you can test his veracity pursuant to the [Connecticut] Code [of Evidence]. You can—you can certainly cross-examine him. But the limit of his felony conviction is limited to the fact that he has one for [operating a motor vehicle while under the influence] and that he's on probation for it."

On cross-examination of the victim, the defense brought out the fact that, at the time of the incident, the victim was on probation for a 2017 felony conviction for operating a motor vehicle while under the influence of intoxicating liquor or drugs and that he was still on probation at the time of trial. Defense counsel also addressed a number of inconsistencies in the victim's testimony. Some of those inconsistencies included the following: (1) although the victim testified on direct examination that he drank a Long Island iced tea while at the defendant's apartment after the bar had closed, he testified on cross-examination that he had the drink at the bar, not the defendant's apartment, and that he actually did not have any drinks at the defendant's apartment; (2) the fact that the victim told a victim's advocate that he had had only one drink at the bar, but, at the emergency department of the hospital, told staff that he had one or two drinks with acquaintances and testified on direct examination that he had three drinks at the bar; (3) the victim testified on direct examination and told a 911 dispatcher that the defendant stole $300 from him, but the victim told a victim's advocate and testified on cross-examination that the defendant took $400 from him; and (4) the victim told staff at the emergency department that he might have been drugged

but never mentioned that to the 911 dispatcher or to the police.

On appeal, the defendant claims that the trial court erred in determining that his proposed questions of the victim were speculative and more prejudicial than probative. According to the defendant, the proposed questions of the victim "went directly to establishing that [the victim] may have had his own reasons for fabricating his allegations," and that, "[w]ithout any evidence of [the victim's] motive to lie, the jury had no reason to disbelieve his claim that [the] defendant forcefully entered his apartment so that he and Moniz could take [the victim's] money." The defendant explains in his brief to this court that "[t]he mere fact that the jury learned that [the victim] had a felony conviction and was on probation did not matter because [the] defendant was unable to show how those things impacted [the victim's] claims." The defendant, thus, claims that the court's ruling, which deprived him of the opportunity to develop the victim's motive and bias, was harmful and warrants a new trial because it violated his constitutional rights to confrontation, to present a defense, and to a fair trial.

Before addressing the merits of the defendant's claim, we set forth our standard of review and the law that guides our analysis. "[T]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . Compliance with the constitutionally guaranteed right to cross-examination requires that the defendant be allowed to present the jury with facts from which it could appropriately draw inferences relating to the witness' reliability. . . . However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, or to whatever extent, the defense might wish. . . . Thus, [t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . .

"Although [t]he general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial [court] . . . this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . If that constitutional standard has been satisfied, then [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . [That is to say] [t]he court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Citation omitted; internal quotation marks omitted.) *State*

v. *Lopez*, 177 Conn. App. 651, 661–62, 173 A.3d 485, cert. denied, 327 Conn. 989, 175 A.3d 563 (2017). Thus, this court "must engage in a two step analysis. We must determine first whether the cross-examination permitted to defense counsel comported with sixth amendment standards . . . and second, whether the trial court abused its discretion in restricting the scope of that cross-examination. . . . Once it is established that the trial court's ruling on the scope of cross-examination is not constitutionally defective, this court will apply [e]very reasonable presumption . . . in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . To establish an abuse of discretion, [the defendant] must show the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Citations omitted; internal quotation marks omitted.) *State* v. *Errol J.*, 199 Conn. App. 800, 807–808, 237 A.3d 747, cert. denied, 335 Conn. 962, 239 A.3d 1213 (2020).

This court has stated that, "[a]lthough only relevant evidence may be elicited through cross-examination . . . [e]vidence tending to show motive, bias or interest of an important witness is never collateral or irrelevant. [Indeed, it] may be . . . the very key to an intelligent appraisal of the testimony of the [witness]. . . . Accordingly, cross-examination to elicit facts tending to show that a witness' testimony was motivated by bias may not be unduly restricted." (Internal quotation marks omitted.) *State* v. *Kehayias*, 162 Conn. App. 310, 323, 131 A.3d 1200 (2016). Therefore, "[a]lthough it is within the trial court's discretion to determine the extent of cross-examination and the admissibility of evidence, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements [of the confrontation clause] of the sixth amendment." (Internal quotation marks omitted.) *State* v. *Jessie L. C.*, 148 Conn. App. 216, 224, 84 A.3d 936, cert. denied, 311 Conn. 937, 88 A.3d 551 (2014). "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Rogelstad*, 73 Conn. App. 17, 22, 806 A.2d 1089 (2002). "In so inquiring, reviewing courts have declined to hold that a defendant's confrontation right was violated by limits on cross-examination when the defendant was allowed to ask other questions about the same motive, bias, or interest." *State* v. *Kehayias*, supra, 327.

In *Kehayias*, this court found that the defendant's constitutional right to confrontation was not violated when the trial court "merely limited, and did not preclude, inquiry into a specific motive that already had

been robustly developed on cross-examination . . . ." Id., 328. In contrast, in *State* v. *Milum,* 197 Conn. 602, 607–608, 500 A.2d 555 (1985), "our Supreme Court found error where the trial court refused to allow the defendant to ask the victim *at all* about either the victim's pending civil suit arising from the same events against the defendant, or about the victim's demand for $25,000 in exchange for her recommendation of a suspended sentence for the defendant." (Emphasis in original.) *State* v. *Kehayias,* supra, 162 Conn. App. 328.

In the present case, the trial court based its ruling on § 6-7 of the Connecticut Code of Evidence, which concerns evidence of a conviction of a crime and provides in relevant part: "For the purpose of impeaching the credibility of a witness, evidence that a witness has been convicted of a crime is admissible if the crime was punishable by imprisonment for more than one year. . . ." See also *State* v. *Clark,* 137 Conn. App. 203, 207, 48 A.3d 135 (2012) (it is well established that "[t]he credibility of a witness may be attacked by introducing the witness' conviction of a crime if the maximum penalty for that conviction is imprisonment exceeding one year" (internal quotation marks omitted)), aff'd, 314 Conn. 511, 103 A.3d 507 (2014). The rule lists a number of factors that the court should consider in determining whether to admit evidence of a conviction, including "the extent of the prejudice likely to arise"; Conn. Code Evid. § 6-7 (a) (1); and "the significance of the particular crime in indicating untruthfulness . . . ." Conn. Code Evid. § 6-7 (a) (2). In determining the admissibility of such evidence, the test is "whether the probative value of the evidence outweighs its prejudicial effect." *State* v. *Martin,* 201 Conn. 74, 88, 513 A.2d 116 (1986). "The trial court, because of its intimate familiarity with the case, is in the best position to weigh the relative merits and dangers of any proffered evidence. . . . This principle applies with equal force to the admissibility of prior convictions." (Internal quotation marks omitted.) *State* v. *Ciccio,* 77 Conn. App. 368, 386, 823 A.2d 1233, cert. denied, 265 Conn. 905, 831 A.2d 251 (2003); see also *State* v. *Harrell,* 199 Conn. 255, 262, 506 A.2d 1041 (1986) ("[the] balancing of intangibles—probative values against probative dangers—is so much a matter where wise judges in particular situations may differ that a [leeway] of discretion is generally recognized" (internal quotation marks omitted)). We also note that "conviction of a crime not directly reflecting on credibility clearly lacks the direct probative value of a criminal conviction indicating dishonesty or a tendency to make false statement. Thus, the balance used to measure admissibility of prior convictions is weighted less heavily toward admitting the prior conviction when it involves a crime related only indirectly to credibility." (Internal quotation marks omitted.) *State* v. *Swilling,* 180 Conn. App. 624, 658, 184 A.3d 773, cert. denied, 328 Conn. 937, 184 A.3d 268 (2018).

In the present case, we must examine whether the court's limitation on the defendant's cross-examination of the victim deprived the defendant of his constitutional right to confrontation and, if not, whether the court's ruling was an abuse of its discretion. Despite the fact that the victim's prior felony conviction of operating a motor vehicle while under the influence of intoxicating liquor or drugs did not involve a crime that reflected on the victim's credibility, the court permitted questioning regarding the victim's conviction of that crime, the name of the crime and the fact that the victim was on probation for his conviction of that crime, both at the time of the incident underlying the charges and at the time of trial. Our Supreme Court has stated that the right to cross-examination under the sixth amendment is satisfied "when . . . the defendant is allowed to impeach the witness by [inquiring into the existence of] a prior, unspecified felony conviction." (Emphasis omitted.) *State* v. *Dobson*, 221 Conn. 128, 137, 602 A.2d 977 (1992). Here, the court went beyond that and permitted the name of the crime underlying the felony conviction, as well as questioning regarding the defendant's probationary status, even though the felony conviction did not involve a crime relating directly to the credibility of the victim. See *State* v. *Swilling*, supra, 180 Conn. App. 658–59 ("[t]o avoid unwarranted prejudice to the witness, when a party seeks to introduce evidence of a felony that does not directly bear on veracity, a trial court ordinarily should permit reference only to an unspecified crime carrying a penalty of greater than one year that occurred at a certain time and place" (internal quotation marks omitted)).

For this court to determine that the defendant's sixth amendment right to confrontation has been met, we must be satisfied that "defense counsel [was] permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) *State* v. *Fernando R.*, 103 Conn. App. 808, 819, 930 A.2d 78, cert. denied, 284 Conn. 936, 937 A.2d 695 (2007). In doing so, we must consider "the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) Id.

First, it is important to note that the trial court did not completely exclude all inquiry regarding the victim's prior felony conviction; in fact, the court permitted questions regarding the felony conviction, the name of the crime underlying the conviction, and the fact that the defendant was on probation for that conviction, and its ruling complied with the requirements of § 6-7 of the Connecticut Code of Evidence. On appeal, the

defendant challenges the court's ruling precluding inquiry regarding (1) the conditions of the victim's probation, (2) the victim's consumption of alcohol on the night in question and whether the victim thought that might result in a violation or change in the conditions of his probation, and (3) whether the victim feared that the allegations of larceny against him for the theft of a watch would result in his arrest and a violation of his probation. The defendant claims that he was deprived of the opportunity to develop the victim's motive and bias because he could not delve further into how the victim's probationary status may have impacted and motivated the victim to fabricate the allegations against the defendant. We do not agree.

We agree with the trial court's determination that the proffered line of questioning was based on speculation and that its probative value was outweighed by its prejudicial effect. With respect to the conditions of the victim's probation and his consumption of alcohol on the night in question, defense counsel acknowledged that the victim's consumption of alcohol would not have been a technical violation of his probation, which required substance abuse treatment, and claimed that the victim might have been worried that the conditions of his probation could potentially change and require him to undergo more substance abuse treatment. The fact that the victim *might* have been worried about a *potential* change in a condition of his probation is clearly within the realm of speculation, and we conclude that the defendant has failed to provide a sufficient foundation to support his claim that the proffered evidence related to the victim's motive to fabricate the allegations against him. This is particularly so given that the victim called the police, prompting his meeting with them. It strains credulity to believe that if the victim was worried about the police learning that he was drinking alcohol he would initiate contact with them so that they could observe him after he had just done so.

Moreover, the defendant's claim that he should have been allowed to question the victim about his motive to fabricate relating to the theft of Moniz' watch is equally unavailing. According to the defendant, the victim's alleged fear that a larceny charge might be brought against him for the theft of Moniz' watch, resulting in a violation of his probation, may have motivated the victim to fabricate the allegations against the defendant. Again, we agree with the court's determination that the proffered questioning was based on speculation. According to the victim's testimony, he "had no idea" what the defendant and Moniz were talking about when they had asked the victim about a watch after hitting him. It was a relatively short time period between when the victim was first confronted about the theft of the watch, and when he called 911 both on the walk to his apartment and immediately after the defendant and

Moniz left his apartment after stealing his rent money. Although the defendant claimed at trial that the victim might have feared that an arrest for larceny would result in a violation of the victim's probation, the defendant never explained to the trial court or to this court how the victim's initiation of contact with the police on the night of the incident was consistent with the victim's desire to avoid police involvement. To the contrary, involving the police in his dispute with the defendant and Moniz only increased the possibility that the two men would accuse the victim of larceny when confronted by the accusation that they assaulted the victim. Under these circumstances, the court was justified in excluding the proffered line of questioning as speculative. Consequently, the court's rulings restricting the defendant's cross-examination of the victim did not violate his sixth amendment right to confrontation. That being the case, "[t]he trial court has broad discretion . . . in determining the admissibility of evidence claimed to be remote, repetitious, or otherwise lacking in probative value." *State* v. *Bova*, 240 Conn. 210, 229, 690 A.2d 1370 (1997). We cannot say that the court abused its wide discretion in determining that the probative value of the evidence did not outweigh its prejudicial effect.

The defendant's attempt to characterize the proffered line of questioning as relating to the victim's state of mind is tenuous and does not change its speculative nature. "The trial court has the discretion to exclude speculative evidence, expert or otherwise." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 123, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012). Although the trial court did not explicitly find that the proffered evidence was irrelevant, it did find the evidence to be speculative in nature, and this court has determined previously that speculative evidence is irrelevant. See *State* v. *Sulser*, 109 Conn. App. 852, 874, 953 A.2d 919, cert. denied, 289 Conn. 939, 959 A.2d 1006 (2008); see also *State* v. *Davis*, 298 Conn. 1, 23–24, 1 A.3d 76 (2010) (trial court did not abuse its discretion in excluding evidence when defendant's foundation for proffered evidence was "wholly speculative"). Moreover, "[a] defendant . . . may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right [to confrontation] is not violated." (Internal quotation marks omitted.) *State* v. *Lee-Riveras*, 130 Conn. App. 607, 622, 23 A.3d 1269, cert. denied, 302 Conn. 937, 28 A.3d 992 (2011).

Finally, we note that the defendant undertook an extensive and robust cross-examination of the victim. As the defendant pointed out in his appellate brief, there were many inconsistencies in the victim's testimony

that he addressed on cross-examination, and the victim's "testimony was so riddled with inconsistencies that, on redirect examination, the prosecutor asked him if he was working nights during the trial, and later suggested to the jurors [that] he was sleep-deprived . . . [as a] reason for the inconsistencies." In fact, the jury found the defendant not guilty of five of the six charges against him, which was indicative that the jury did not credit all of the victim's testimony. The issues related to the victim's probationary status on which the court excluded questioning were marginally related, at best, to the issues in the case. "Every evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error." (Internal quotation marks omitted.) *State* v. *Moye*, 214 Conn. 89, 95, 570 A.2d 209 (1990). In the present case, the defendant was afforded the opportunity on cross-examination "to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the [victim's] reliability . . . ." (Internal quotation marks omitted.) Id.

We conclude that the court's ruling limiting the defendant's cross-examination of the victim did not impermissibly infringe on his constitutional right to confrontation.[5] Having found no constitutional violation, we also conclude that the court's evidentiary ruling was not a clear abuse of the court's wide discretion. See *State* v. *Lopez*, supra, 177 Conn. App. 662.

II

The defendant next claims that the trial court's jury instruction on burglary in the second degree misled the jury because the court never instructed the jury on the definitions of two terms, "physical threat" and "imminent," set forth in the elements of threatening in the second degree, which was one of the alleged underlying crimes for the burglary charge. The state counters that the defendant waived his claim of instructional error. We agree with the state.

For this court to address the issue of waiver, it is necessary to provide a detailed account of what transpired between the court and the parties, and, thus, we set forth the following additional facts, as gleaned from the record. Count six of the third substitute information charged the defendant with burglary in the second degree, alleging that, on January 29, 2018, between 1 and 2:50 a.m., he entered or remained unlawfully in a dwelling, while the victim was present in such dwelling, with the intent to commit a crime therein, namely, robbery in the first degree, robbery in the second degree, threatening in the second degree, and/or larceny in the sixth degree.

The defendant's trial commenced on May 15, 2019. After the jury was excused and before the court

adjourned for that day, the court stated: "Counsel, before we adjourn for today, I had to—I should let you know that I have a draft of the jury instructions ready. It is a draft. It is a rough draft. We will have a conference at the end of all the evidence, and I certainly will welcome any—any comments, suggestions, requests, or otherwise. If you want to have a copy of the draft instructions now, I'm happy to give it to you." The next day, May 16, 2019, the court stated: "[B]efore you get started, I'd like to just put on the record that yesterday, at the close of evidence, the court gave both parties a draft of the jury instructions. It's a draft. Obviously, we're going to have a charging conference at the end of all the evidence. I just want everybody to have an ample opportunity to review it, to make comments or suggestions or additions or subtractions, and we'll take care of that at the right time. But I just want to put on the record that everybody has a copy of the draft instructions." Evidence and testimony continued on May 16 and Friday, May 17, 2019. At the close of the day on May 17, the prosecutor stated that he had a request to charge that he could file that day so that defense counsel and the court could review it over the weekend. In response, the court requested that both the state and the defendant submit proposed charges and stated that, if time allowed, they would have a charging conference on Monday. When defense counsel requested that the court permit her to submit a proposed charge on Monday, the court agreed to the request.

On Monday, May 20, 2019, defense counsel explained to the court that the one witness she had planned to call that day would not be testifying and that she needed time to discuss with the defendant whether he would testify. She also asked for additional time to look over the state's supplemental request to charge, which she had just received that morning, to which the court replied: "Well, you've had the court's version, right, for some time, right?" Defense counsel stated, "yes," in response to the question, and the court granted her request for additional time. At 11:30 a.m., when court resumed, defense counsel informed the court that the defendant would not be testifying. After the court canvassed the defendant, it addressed the issue of whether it would charge the jury that afternoon or wait until the next day. After a discussion with counsel, it was decided that the jury would be instructed the following day. Subsequently, the defense made an oral motion for a judgment of acquittal, which the court denied. Thereafter, the court stated: "So, now we have the opportunity to have a jury charge conference. I've— the court has provided copies of the court's instruction on Wednesday, May 15. It's now Monday, May 20. The court received on Friday the state's request for charge. The court also received this morning a supplemental request to charge, and this morning the court received

the defendant's request to charge."

The court then proceeded to address the state's request to charge, each time asking the defense for comment with respect to each issue addressed. As to each issue, after hearing comments from both sides, the court stated whether it adopted the request and, if so, the language of the instruction with the modification. The court followed the same procedure concerning the defendant's request to charge. After the court addressed all of the issues raised in the defendant's request to charge, it asked: "Anything else we should address in the instructions?" Defense counsel replied: "Nothing further, Your Honor." The court next addressed the state's supplemental request to charge, after which it, again, asked if there was anything else that needed to be addressed at that time. Defense counsel replied: "Nothing with regard to the jury charge, Your Honor." The written requests to charge filed by the state[6] and the defendant[7] did not raise any issues concerning either the court's proposed charge on burglary in the second degree or its charge on threatening in the second degree as a crime underlying the burglary charge. Nor did either party or the court address any issue relating to the court's proposed charge on threatening in the second degree as alleged in count six during the charging conference, despite the court's repeated requests of counsel as to whether anything further needed to be addressed.

At the charging conference, the state did raise a claim concerning the jury charge as to count six as it related to the underlying offense of larceny in the sixth degree. Specifically, the prosecutor asked whether the court was "going to instruct the jury on the elements . . . of larceny" in the sixth degree. The issue concerned whether the court would charge the jury regarding the element of the monetary amount needed for larceny in the sixth degree. The court then stated: "Counsel, hold on. The elements of count six are as follows. A person is guilty of burglary in the second degree when such person unlawfully enters and/or remains in a dwelling, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein. . . .

"For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. One, the first element is that the defendant knowingly and unlawfully entered and/or remained in a dwelling. A person acts knowingly with respect to conduct or circumstances when he is aware that his conduct is of such nature or that such circumstances exist. Dwelling means a building that is usually occupied by a person lodging therein at night. Therefore, a structure that cannot possibly be occupied as a lodging cannot be a dwelling.

"You must also determine whether the defendant

unlawfully entered and/or remained in the dwelling. A person unlawfully enters and/or remains in a dwelling when he is not licensed or privileged to do so. To be licensed or privileged, the defendant must either have consent from the person in possession of the dwelling or have some other right to be in the dwelling. To enter, etcetera, etcetera.

"Element two, to commit a crime therein. The second element is that the defendant intended to commit a crime in that dwelling. A person acts intentionally with respect to a result when his conscious objective is to cause such result.

"Even if the defendant never actually committed a crime in the dwelling, if the evidence establishes beyond a reasonable doubt that [he] was [there] with such [intent], that is sufficient to prove that the defendant unlawfully entered and/or remained in the dwelling with the intent to commit a crime therein. . . .

"In this case, the state claims that the defendant intended to commit the crimes of robbery in the first degree and/or robbery in the second degree and/or threatening in the second degree and/or a larceny in the sixth degree. I have previously defined the crimes of robbery in the first degree, robbery in the second degree, and larceny. I refer you to those definitions above.

"Threatening in the second degree is defined as, etcetera, etcetera, etcetera.

"If you unanimously find that the state has proved beyond a reasonable doubt each of the elements of the crime of burglary in the second degree, then you shall find the defendant guilty."

At no point during the discussion at the charging conference concerning count six and whether the charge needed to include the monetary element to support an allegation of larceny as an underlying crime, or when the court specifically referenced the threatening charge, did the defendant raise any issue concerning the failure of the court's charge to address the elements of the crime of threatening in the second degree. At the end of the charging conference on May 20, 2019, the court again asked if there was anything else that needed to be addressed with respect to the jury instructions, to which defense counsel replied: "Nothing from the defense." Following a short break, the court provided counsel with a copy of the jury instructions, which included any changes from the charging conference, and stated that they could talk about anything further regarding the proposed charge at 9:30 a.m. the next morning.

After court convened on May 21, 2019, the court first addressed some minor spelling, punctuation, and grammatical changes it had made to the charge, and then it discussed another issue raised by the parties the previ-

ous day. When the court asked if there was anything else that should be addressed, defense counsel stated that she had one more concern regarding the jury instructions, which related to the definition of serious physical injury, and the court addressed the issue. When the court charged the jury regarding burglary in the second degree, it stated, in part: "[T]he state claims the defendant intended to commit the crimes of robbery in the first degree, and/or robbery in the second degree, and/or threatening in the second degree, and/or a larceny in the sixth degree. I have previously defined the crimes of robbery in the first degree, robbery in the second degree, and larceny. I refer you to those definitions above.

"Threatening in the second degree is defined in [§] 53a-62 (a) (1) of the Connecticut General Statutes as follows. A person is guilty of threatening in the second degree when that person, by physical threat, intentionally places or attempts to place another person in fear of imminent serious physical injury."

After the court completed its charge to the jury and the jury had exited the courtroom, the following colloquy occurred:

"The Court: Before we take the luncheon recess, does anybody have any comments on the instructions as read to the jury?

"[The Prosecutor]: None from the state, Your Honor.

"[Defense Counsel]: None from the defense."

On appeal, the defendant claims that the court's jury instructions on burglary in the second degree were inadequate and constitutionally defective in that the court, other than reading the statutory language for the crime of threatening in the second degree, failed to instruct the jury on the elements of threatening, as one of the crimes underlying the burglary charge. The record, however, belies this claim. Pursuant to § 53a-62, the statute governing threatening in the second degree, the state had to prove beyond a reasonable doubt that the defendant made a physical threat to the victim and that he specifically intended by his conduct to put the victim in fear of imminent serious physical injury. See, e.g., *State* v. *Ervin B.*, 202 Conn. App. 1, 7–8, 243 A.3d 799 (2020). In the present case, the court instructed the jury that "[a] person is guilty of threatening in the second degree when that person, by physical threat, intentionally places or attempts to place another person in fear of imminent serious physical injury." Just prior to that instruction, the court also had instructed the jury that "[a] person acts intentionally with respect to a result when his conscious objective is to cause such result." The court, thus, informed the jury of the essential elements of threatening in the second degree. The defendant's real claim, therefore, is that the court erred in failing to define in greater detail the elements of the

crime of threatening in the second degree. Specifically, he takes issue with the court's failure to define the terms "physical threat" and "imminent," as used in § 53a-62.

At no time during the proceedings relating to the jury charge did the defendant raise this claim to the trial court. The defendant concedes that he neither filed a request to charge on burglary in the second degree nor objected to the court's instructions, and requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[8] Alternatively, he seeks review of this claim pursuant to the plain error doctrine. See Practice Book § 60-5. The state, relying on *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), counters that the defendant's claim of instructional error is not reviewable under *Golding* because the defendant implicitly waived it. Moreover, with respect to the defendant's claim of plain error, the state argues that the defendant failed to show that any error in the court's instructions as to threatening in the second degree was so grievous that a failure to reverse the judgment would result in manifest injustice. We agree with the state.

A

We first address the issue of implied waiver under *Kitchens* and set forth our standard of review and the applicable law governing an implied waiver of a claim of instructional error. "Whether a defendant has waived the right to challenge the court's jury instructions involves a question of law, over which our review is plenary." *State* v. *Ramon A. G.*, 190 Conn. App. 483, 500, 211 A.3d 82 (2019), aff'd, 336 Conn. 386, 246 A.3d 481 (2020); see also *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 312–13, 112 A.3d 1 (2015) (even though inquiry regarding implied waiver of jury instruction is fact intensive, appellate court's determination of whether to draw inference of waiver must be based on close examination of record and particular facts and circumstances of case, and that decision involves question of law over which plenary review applies). "The doctrine of implied waiver is based on the idea that counsel had sufficient notice of . . . the jury instructions and was aware of their content . . . ." (Internal quotation marks omitted.) *State* v. *Davis*, 311 Conn. 468, 477–78, 88 A.3d 445 (2014).

In *State* v. *Kitchens*, supra, 299 Conn. 482–83, our Supreme Court provided a framework for review of whether a claim of instructional error has been waived, and our analysis begins with that seminal decision. In *Kitchens*, the defendant claimed that the trial court improperly instructed the jury on the intent element needed for a finding of guilty of charges of kidnapping in the second degree and unlawful restraint in the first degree. Id., 462. On appeal, the defendant conceded that his claim was unpreserved and sought review pur-

suant to *Golding*. Id., 462–63. In addressing this claim, our Supreme Court stated that "[i]t is well established in Connecticut that unpreserved claims of improper jury instructions are reviewable under *Golding* unless they have been induced or implicitly waived." Id., 468. Specifically, the court explained: "[I]n the usual *Golding* situation, the defendant raises a claim on appeal [that], while not preserved at trial, at least was not waived at trial. . . . [A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . ." (Internal quotation marks omitted.) Id., 467.

In *Kitchens*, our Supreme Court reexamined and clarified the law in Connecticut concerning implied waiver; id., 474; and concluded "that, when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case." Id., 482–83. In *Kitchens*, the court had reminded defense counsel two times of his right to file a request to charge, and each time, defense counsel declined to file such a request; two additional charge conferences were held by the court to discuss the instructions, at which defense counsel never raised an issue with the intent instructions concerning kidnapping and unlawful restraint, and stated that there was nothing further that he wanted to discuss; and defense counsel did not take an exception to the charge as given. Id., 498–99. Thus, our Supreme Court concluded that, under those circumstances, "defense counsel's repeated statements indicating his affirmative acceptance of the proposed jury instructions after being given a meaningful opportunity to review them constituted an implicit waiver of the defendant's claim of instructional error." Id., 498.

In *State* v. *Davis*, supra, 311 Conn. 468, our Supreme Court "noted that in every post-*Kitchens* case in which defense counsel was given the opportunity to review the proposed jury instructions overnight, [it has] concluded that defense counsel had received a meaningful opportunity to review the proposed instructions under the *Kitchens* test . . . ." (Citation omitted; internal quotation marks omitted.) Id., 480–81; see also *State* v. *Webster*, 308 Conn. 43, 63, 60 A.3d 259 (2013) (defense counsel had meaningful opportunity to review proposed instructions when counsel had opportunity to review

instructions overnight).

For example, in *State* v. *Bellamy*, 323 Conn. 400, 410, 147 A.3d 655 (2016), our Supreme Court concluded that the defendant implicitly waived his claim of instructional error pursuant to *Kitchens*, stating: "In the present case, all of the [*Kitchens*] criteria were satisfied. The trial court gave both defense counsel and the state a copy of its proposed jury instructions four days before the charging conference. Two of the four days fell on a weekend, thus providing counsel with even more time to review the instructions. The court also solicited comments from counsel regarding modifications to the instructions during the in-chambers charging conference, during the proceedings in open court directly after the charging conference and on the following day immediately before instructing the jury. In addition, when the court discussed portions of the identification instruction on the record, defense counsel expressed no dissatisfaction with the instruction, although he commented on several other instructions. Counsel thus indicated that he had read and understood the instructions in their entirety and took no issue with any part, including the instruction on identification. Finally, defense counsel explicitly conceded during the sentencing hearing that he had agreed with the substance of the jury instructions before they were given and that his only objection was to the speed with which they had been delivered by the court."

The facts of the present case are squarely on point with *Bellamy* and *Kitchens*. Here, the court provided the state and defense counsel with a copy of its proposed jury instructions on the first day of trial, May 15, 2019, five days before the charging conference, two of which were weekend days. The court stated on the record that it wanted to give everyone "ample opportunity to review it, to make comments or suggestions or additions or subtractions . . . ." The court held an on-the-record charging conference on May 20, 2019, during which it addressed the instructions requested by the state and the defendant in their written requests to charge, giving each party the opportunity to address each requested instruction and any proposed modifications. During that conference, the court asked defense counsel multiple times if there were any other issues that needed to be addressed, and each time defense counsel replied in the negative. The defendant's request to charge did not raise any issue concerning either the court's proposed charge on burglary in the second degree, as alleged in count six of the third substitute information, or its charge on threatening in the second degree as a crime underlying the burglary charge. Even when the state raised an issue at the charging conference related to count six and the underlying larceny charge, which was discussed at length by the parties and the court, the defendant never alerted the court to his claim that the jury instructions related to count six

and the underlying threatening charge improperly failed to include the elements of threatening in the second degree. The court again asked defense counsel at the end of the charging conference whether anything else needed to be addressed, to which defense counsel replied, "[n]othing from the defense." The parties were then provided with copies of the proposed charge, with any alterations included from the charging conference, to review overnight. The next day, before the court instructed the jury, defense counsel raised an issue regarding the jury instruction on serious physical injury, which the court addressed. Finally, after the court instructed the jury, the court asked if counsel had any comments on the instructions as read to the jury, to which defense counsel replied, "[n]one from the defense."

The record in the present case more than demonstrates that the *Kitchens* waiver criteria have been met. On numerous occasions, the court solicited comments from counsel regarding any issues with the proposed instructions, and multiple times defense counsel explicitly stated that there was nothing from the defense. The instructions were provided to counsel for review six days prior to when the jury was charged, and, at a minimum, counsel had the opportunity to review, overnight, the instructions as modified from the charging conference. At no time before the final charge was given to the jury, or after the charge, did defense counsel raise any issue or objection concerning the jury instructions relating to the underlying threatening charge in count six, despite having had numerous opportunities and a great amount of time to do so. Because it is clear from the record that defense counsel had a meaningful opportunity to review the proposed instructions and to comment on them or suggest modifications, and counsel affirmatively accepted the instructions as proposed and given by repeatedly telling the court that the defense did not have any other issues to raise concerning the instructions, the defendant implicitly waived his right to challenge those instructions on appeal. Accordingly, he is not entitled to *Golding* review of his unpreserved claim of instructional error.

B

One day prior to oral argument before this court, defense counsel filed a notice with this court, pursuant to Practice Book § 67-10, of two cases, not mentioned in the one brief that was filed by the defendant, that were asserted to be pertinent to the defendant's claim of instructional error. Specifically, defense counsel cited *State* v. *Brown*, 299 Conn. 640, 659, 11 A.3d 663 (2011), and *State* v. *Ruocco*, 151 Conn. App. 732, 742–43, 95 A.3d 573 (2014), aff'd, 322 Conn. 796, 144 A.3d 354 (2016), for the proposition that "the state bears the burden of proving the defendant waived a claim of instructional error."[9] At oral argument before this court,

the defendant's appellate counsel referenced the point in the charging conference when the trial court, while reciting the proposed charge on burglary in the second degree as alleged in count six, stated: "Threatening in the second degree is defined as, etcetera, etcetera, etcetera." She claimed, for the first time, that, because there is no copy in the record of the trial court's proposed charge, a draft of the proposed charge was never made an exhibit, and there is not enough evidence to determine what was in the draft of the court's proposed charge, the state has failed to meet its burden of providing an adequate record to show that there was *Kitchens* waiver.

Before we discuss the merits of this claim, a brief discussion of the facts of *Brown* and *Ruocco* is necessary. In *Brown*, the defendant raised two unpreserved claims of instructional error on appeal. *State* v. *Brown*, supra, 299 Conn. 643. With respect to the first claim, our Supreme Court concluded that, pursuant to *Kitchens*, the defendant implicitly had waived his right to challenge the court's instructions on intent and was not entitled to *Golding* review of that unpreserved claim. Id., 658–59. With respect to the second claim, which related to the court's instructions concerning liability under the doctrine set forth in *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), the court found that the case was distinguishable from *Kitchens*. *State* v. *Brown*, supra, 659. Specifically, the court stated: "Because we have no record of the charging conference or copy of the court's intended charge, we do not know if the trial court expressly rejected the state's proper request to charge [which included an instruction on *Pinkerton* liability], or included the proper instruction in the copy of the charge that it provided to counsel, but inadvertently omitted it from the actual charge to the jury. The elements of *Pinkerton* liability are well established. . . . It is reasonable to assume, therefore, that the omission was inadvertent. Under these circumstances, we cannot determine from the record whether the copy of the final instructions given to defense counsel included the correct charge or the charge as actually given. Thus, unlike in *Kitchens*, we cannot infer that defense counsel had knowledge of any potential flaws in the court's *Pinkerton* instruction. . . . Because we cannot reasonably conclude that counsel was aware in advance of the instructional deficiency, we will not conclude that the defendant has waived his right to challenge the charge on direct appeal." (Citations omitted.) Id.

In *Ruocco*, the defendant claimed on appeal that the trial court erred in failing to instruct the jury that it may draw no unfavorable inferences from the failure of the defendant to testify, as mandated by General Statutes § 54-84 (b). *State* v. *Ruocco*, supra, 151 Conn. App. 734. Although the state and the defendant conceded that the mandatory instruction had not been

given to the jury; id., 738–39; the state claimed that the record was inadequate for review of the defendant's claim because "it [was] ambiguous as to whether the defendant waived the mandatory instruction . . . ." Id., 739. In *Ruocco*, "[a]fter the parties presented their closing arguments, and before adjourning for its lunch recess, the court stated: 'Counsel, I've given you each a copy of my proposed charge. . . . [I]f you have any questions, or concerns, or comments, I'll be available at 1:30 in my chambers. If I don't see you at 1:30, I'll just assume that you have no comments or questions. But we will be starting a little before 2 because I'd like to have as much time this afternoon for the jury and its deliberations.' After the recess, the jury entered the courtroom and the court gave the jury charge. The court did not put on the record whether any party had come to its chambers to discuss the charge. Furthermore, there is no reference to any charge conference and no copy of the proposed charge in the record." Id.

On appeal, the parties in *Ruocco* disagreed as to whether the record was adequate for review of the defendant's instructional error claim. Id., 740. According to the state, there was "a possibility that the defendant could have waived [the mandatory instruction] in an in-chambers conference during the lunch recess"; (internal quotation marks omitted) id.; and the defendant, as the appellant, had the burden of providing an adequate record. Id., 741. This court rejected the state's claim and concluded "that the record . . . [was] clear, unambiguous, and adequate for review with respect to the defendant's claim that the court improperly refrained from giving the no unfavorable inference instruction. Presuming that the trial court acted properly, as we must, the record leads to the conclusion that no off-the-record charge conference occurred. Had an in-chambers charge conference occurred, as the state suggests, then a court acting properly would have summarized it on the record . . . . There is no record of either party taking exception to the charge and no record of the defendant waiving the mandatory instruction . . . ." (Footnotes omitted.) Id. We explained further that, "[i]f the state intends to argue that the defendant waived a mandatory instruction, the burden is on the state to secure an adequate record to support that argument"; id., 742; as it would have been "manifestly unjust" to place the burden on the defendant to secure an adequate record to review the state's claim. Id., 743.

We conclude that the present case is distinguishable from both *Brown* and *Ruocco*. First, unlike the situation in *Brown*, in which there was no record of a charging conference or a copy of the court's intended charge, the court in the present case held an on-the-record charging conference, in which it addressed each requested instruction from the state and the defendant, and gave the parties multiple opportunities to comment on those requests and the court's proposed charge.

Although the record does not contain a copy of the court's proposed charge, our Supreme Court observed in *Bellamy* that "the waiver rule in *Kitchens* does not require that a copy of the proposed jury instructions be marked as an exhibit. It only requires evidence that the trial court gave the parties a 'copy of the proposed jury instructions' and that the reviewing court's determination of implied waiver 'be based on a close examination of the record and the particular facts and circumstances of each case.' " *State* v. *Bellamy*, supra, 323 Conn. 411.

It is also clear from the record in the present case that, when the court was reciting the language of the proposed instruction concerning the second degree burglary charge in count six, which was in response to an issue raised concerning a different underlying offense, larceny, the court used the words "etcetera, etcetera, etcetera," to skip over language in the proposed charge that was not relevant to the issue that had been raised. Neither party made a request to charge related to the instruction on threatening in count six, and no claim has been made that the court's final instruction to the jury regarding that offense differed in any way from the proposed charge that had been given to the parties on the first day of trial, except with respect to the few grammatical and spelling corrections the court had made on the morning of May 21, 2019. This is not a situation, as in *Brown*, involving on appeal an issue of whether the final charge to the jury differed from the proposed instructions the parties had been given for review, which required a review of the proposed instructions.

Likewise, we conclude that the defendant's reliance on *Ruocco* is misplaced. In that case, in which the state claimed that a mandatory jury instruction may have been waived by the defendant during an off-the-record charging conference that may have occurred, we concluded that it would have been unfair to place the burden on the defendant to provide an adequate record to review the state's claim. Thus, we concluded that the state had the burden of providing an adequate record for its claim of waiver, which was not made on the basis of *Kitchens*. The record in the present case is adequate for this court to closely examine the particular facts and circumstances and to make a determination of whether an implicit waiver has occurred. See *State* v. *Bellamy*, supra, 323 Conn. 411.

C

Having determined that the defendant is not entitled to *Golding* review of his unpreserved claim of instructional error, we next address his alternative claim that the court's instruction amounted to plain error. See Practice Book § 60-5. Our Supreme Court determined in *State* v. *McClain*, 324 Conn. 802, 815, 155 A.3d 209 (2017), that a *Kitchens* waiver does not preclude plain

error review, and, thus, we address this claim. Although the defendant attempts to couch his claim in constitutional terms by arguing that the court failed to instruct the jury on the essential elements of the underlying crime of threatening in the second degree; see *State* v. *Gooden*, 89 Conn. App. 307, 315, 873 A.2d 243 ("[t]he trial court is constitutionally required to instruct the jury properly on every essential element of the crime charged" (internal quotation marks omitted)), cert. denied, 275 Conn. 919, 883 A.2d 1249 (2005), and cert. denied, 275 Conn. 918, 883 A.2d 1249 (2005); as stated previously in this opinion, the court's charge to the jury did set forth the essential elements of threatening in the second degree under § 53a-62, and the defendant's claim essentially challenges the court's failure to define the terms "physical threat" and "imminent" as set forth in § 53a-62.

"It is well established that the plain error doctrine . . . is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice of the aggrieved party. . . . That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernable] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . [A] complete record and an obvious error are prerequisites for plain error review . . . . [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Moon*, 192 Conn. App. 68, 97–99, 217 A.3d 668 (2019), cert. denied, 334 Conn. 918, 222 A.3d 513 (2020).

In the present case, we must determine whether the court's failure to define the elements of "physical threat" and "imminent" in its jury instructions relating to count six and the underlying charge of threatening in the second degree constituted plain error. First, the defendant has not demonstrated that the word "imminent" as used in the statute has " 'anything other than

its ordinary meaning.' " *State* v. *Walker*, 9 Conn. App. 373, 378, 519 A.2d 83 (1986), cert. denied, 202 Conn. 805, 520 A.2d 1286 (1987); see also *State* v. *March*, 39 Conn. App. 267, 273, 664 A.2d 1157 (1995) (" '[w]hen a word contained in an essential element carries its ordinary meaning, failure to give the statutory definition will not constitute error' "), cert. denied, 235 Conn. 930, 667 A.2d 801 (1995). Second, this court recently addressed a sufficiency of the evidence challenge to the "physical threat" requirement of threatening in the second degree and stated "that a threat, by definition, is an expression of an intent to cause some future harm," and that that definition was "consistent with the dictionary definition of a threat as [a] communicated intent to inflict harm or loss on another . . . . Black's Law Dictionary (11th Ed. 2019) p. 1783; see also Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 1302 (defining threat as expression of intention to inflict evil, injury, or damage . . .)." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Ervin B.*, supra, 202 Conn. App. 8. The defendant, therefore, has not shown that the trial court's failure to include the definitions of "imminent" and "physical threat" in its jury charge constituted plain error. See *State* v. *Coltherst*, 87 Conn. App. 93, 109 n.11, 110, 864 A.2d 869 (concluding that any error was harmless when court's jury charge included essential elements of larceny but failed to define one of those elements), cert. denied, 273 Conn. 919, 871 A.2d 371 (2005).

We also note that count six of the third substitute information alleges that the defendant committed burglary in the second degree on the basis of his having entered or having remained unlawfully in the victim's apartment, while the victim was present, with the intent to commit any, some or all of the four different underlying crimes therein, namely, robbery in the first degree, robbery in the second degree, threatening in the second degree and larceny in the sixth degree. Because the defendant also had been charged in counts three and four with robbery in the first degree and robbery in the second degree, and was found not guilty of those charges, the guilty verdict of burglary in the second degree in count six could have been based on a finding either that the defendant intended to commit the crime of threatening in the second degree or that he intended to commit the crime of larceny in the sixth degree while in the dwelling. Because the jury returned a general verdict as to count six, we do not know on which underlying crime the jury based its verdict—threatening in the second degree or larceny in the sixth degree. Moreover, the defendant has not raised on appeal any challenge to the jury instructions or the sufficiency of the evidence relating to the underlying crime of larceny in the sixth degree as alleged in count six.

In charging the jury as to larceny, the court explained

that "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself, he wrongfully takes, obtains, or withholds such property from an owner." The court further explained that "[l]arceny in the sixth degree is a larceny where the value of the property is less than $500."

The evidence in the record was sufficient for the jury to have found that the defendant committed burglary in the second degree by entering or remaining unlawfully in the victim's apartment, while the victim was present, with the intent to commit larceny in the sixth degree while therein. The victim testified that the defendant and Moniz forced the victim into his apartment, and that, once inside, the defendant took his money. Although there was a discrepancy as to how much money was stolen from the victim, either $300 or $400, either value was less than $500. There also was evidence in the record, including testimony, demonstrating that the defendant and Moniz matched the descriptions of the perpetrators given by the victim and had been apprehended a short distance from the victim's apartment within minutes of the larceny, that the defendant initially did not comply with requests of police officers to stop but eventually walked back toward the officers, that two 100 dollar bills were found on the sidewalk in the area where the defendant had attempted to walk away, and that two $50 bills were taken from Moniz and tagged as evidence.

The jury returned a general verdict finding the defendant guilty as to count six of the third substitute information, and the evidence supports the defendant's conviction of the burglary charge on the basis of larceny in the sixth degree as the underlying crime. The defendant conceded this in his brief when he stated: "In addition, the [instructional] error was not harmless, even though there was enough evidence (by [the victim's] account) that [the] defendant intended to commit a larceny."

We find the decision of the United States Supreme Court in *Griffin* v. *United States*, 502 U.S. 46, 47, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), instructive on this issue. In that case, the United States Supreme Court addressed the issue of "whether, in a federal prosecution, a general guilty verdict on a multiple-object conspiracy charge must be set aside if the evidence is inadequate to support conviction as to one of the objects." The petitioner had been charged with conspiring to defraud the federal government, and the unlawful conspiracy was alleged to have had two objects. Id. The evidence introduced at trial implicated the petitioner in the first object but did not connect her to the second one. Id., 47–48. Nevertheless, the jury was instructed in a manner that permitted it to return a guilty verdict against the petitioner if it found that she had participated in either one of the two objects of the conspiracy. Id., 48. The United States Court of Appeals for the Sev-

enth Circuit rejected the argument "that the general verdict could not stand because it left in doubt whether the jury had convicted her" as to the first or second object of the conspiracy. Id.

In affirming the judgment, the United States Supreme Court in *Griffin* explained: "It was settled law in England before the Declaration of Independence, and in this country long afterwards, that a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds—even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action. . . . [I]n the United States, with but few exceptions, the courts have united in sustaining general judgments on an indictment in which there are several counts stating cognate offences, irrespective of the question whether one of these counts is bad. . . . In criminal cases, the general rule . . . is that if there is any one count to support the verdict, it shall stand good, notwithstanding all the rest are bad. And it is settled law in this court, and in this country generally, that in any criminal case a general verdict and judgment on an indictment or information containing several counts cannot be reversed on error, if any one of the counts is good and warrants the judgment, because, in the absence of anything in the record to show the contrary, the presumption of law is that the court awarded sentence on the good count only." (Citation omitted; internal quotation marks omitted.) Id., 49–50. That common-law rule has been applied in a number of contexts, including within the context of "a general jury verdict under a *single* count charging the commission of an offense by two or more means." (Emphasis in original.) Id., 50.

The rule set forth in *Griffin* was first cited with approval by our Supreme Court in *State* v. *Chapman*, 229 Conn. 529, 540–41, 643 A.2d 1213 (1994). In *Chapman*, our Supreme Court held that, when "the state charges that a defendant has committed a crime in more than one way, and those ways are charged in the conjunctive, as they must be, and the trial court instructs, as it must, that the state need only prove one of its allegations, and not all, the verdict must be upheld so long as there is sufficient evidence under any of the allegations." Id., 543. The court further explained that, "[i]n effect, we assume that the jury found the defendant guilty under the supported allegation, rather than the unsupported allegation." Id., 543–44. Since *Chapman* was decided, our appellate courts have adhered to this general rule. See, e.g., *State* v. *Gaines*, 257 Conn. 695, 718 n.16, 778 A.2d 919 (2001); *State* v. *Dyson*, 238 Conn. 784, 795, 680 A.2d 1306 (1996); *State* v. *Wright*, 111 Conn. App. 389, 396, 958 A.2d 1249 (2008), cert. denied, 290 Conn. 907, 962 A.2d 795 (2009); *State* v. *Torres*, 82 Conn. App. 823, 833–34, 847 A.2d 1022, cert. denied, 270 Conn. 909, 853 A.2d 525 (2004); *State* v. *Tinsley*, 47 Conn. App. 716, 718–20, 706 A.2d 1008, cert. denied,

244 Conn. 915, 713 A.2d 833 (1998).

In the present case, the state cites to *Griffin* in its brief and argues: "Where, as here, the state alleges in one count several alternative ways of committing a crime, and the 'trial court instructs, as it must, that the state need only prove one of its allegations, and not all, the verdict must be upheld so long as there is sufficient evidence under any of the allegations.' *State* v. *Wohler*, 231 Conn. 411, 415 [650 A.2d 168] (1994); see *Griffin* v. *United States*, [supra, 502 U.S. 56–57] (when jury returns guilty verdict on indictment charging several acts in the conjunctive, verdict must stand if evidence is sufficient with respect to any one of the acts). Because the evidence here was sufficient to support a finding by the jury that the defendant intended to commit, for example, the crime of sixth degree larceny . . . and because the trial court correctly instructed the jury on that crime . . . any error in its instructions on threatening was harmless beyond a reasonable doubt." (Citation omitted.) The defendant never responded to these arguments by filing a reply brief addressing the state's discussion of the relevance of *Wohler* and *Griffin*.

We also note that our Supreme Court and the United States Supreme Court have discussed and distinguished the situation involved in *Griffin*, in which one of the possible grounds for conviction was not supported by sufficient evidence, from those in which the basis for the conviction is legally insufficient or invalid, to which the rule in *Griffin* does not apply.[10] See *Griffin* v. *United States*, supra, 502 U.S. 54–60; *State* v. *Chapman*, supra, 229 Conn. 540–41. We do not glean from the record that the defendant has made any such claim of legal invalidity here. Although the defendant cites to *Chapman* in his brief for the proposition that a reversal of the judgment is required "if one theory charged is legally inadequate and cannot determine [the] basis for conviction," his brief is devoid of any analysis or argument asserting that the jury's verdict of guilty of burglary in the second degree was based on a legally inadequate theory of recovery. On the contrary, the defendant states in his brief that, "[w]hile there was evidence of threats made at Moniz' apartment, [the victim] did not testify about any threats, physical or otherwise, at the time [the] defendant entered or remained in his apartment before obtaining the money. Although he claimed that, as they were leaving, [the] defendant threatened to shoot him if he told anybody, those were mere words and did not amount to a physical threat. Even if it somehow did, it was not a threat of imminent physical injury." Those assertions sound more in the nature of a sufficiency of the evidence claim, rather than one of legal insufficiency.

Moreover, to the extent that the defendant's claim of instructional error can be construed as a claim that his

conviction of burglary in the second degree was based on a legally insufficient ground, we rely on *Chapman* and its progeny, and the rule of law set forth therein, simply to demonstrate why this case does not present the type of extraordinary situation in which plain error can be found. If a factually supported verdict stands, even when there is no assurance that a valid ground, rather than an invalid one, was the basis for the jury's verdict, we are hard-pressed to find plain error under the circumstances here when (1) the defendant was charged in count six with having committed burglary in the second degree on the basis of more than one underlying crime, (2) one of those underlying crimes alleged—larceny in the sixth degree—was supported by sufficient evidence in the record, (3) the defendant's challenge to the jury charge on another underlying crime—threatening in the second degree—does not allege that the theory of conviction was contrary to the law in that it was time barred or that the defendant's actions at issue were protected by the constitution, and (4) the defendant's claim of instructional impropriety concerns the court's failure to define the terms "imminent" and "physical threat," as they relate to the underlying threatening charge, and does not allege any misstatement of law by the court, the defendant has not cited any authority that required the court specifically to charge the jury on those definitions other than the model criminal jury instructions on the Judicial Branch website; see Connecticut Criminal Jury Instructions, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited June 23, 2021); which are meant as a guide for judges and attorneys and are discretionary; *State* v. *Reyes*, 325 Conn. 815, 822 n.3, 160 A.3d 323 (2017); and the defendant failed to show that those terms do not carry their ordinary meaning, which weighs against finding any constitutional error in the court's failure to define the terms.

The defendant, therefore, has not shown that a failure to reverse the judgment would result in manifest injustice; see *State* v. *Moon*, supra, 192 Conn. App. 99; and, thus, his claim of plain error fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also raised a claim on appeal concerning his conviction, after a trial to the court, of being a persistent felony offender in violation of General Statutes § 53a-40 (g) and the court's denial of his motion to dismiss the part B information, which charged him as such on the basis of his two prior convictions in 2000 and 2006 of possession of narcotics in violation of General Statutes § 21a-279 (a). His motion to dismiss the part B information was based on the fact that, pursuant to Public Acts, Spec. Sess., June, 2015, No. 15-2 (P.A. 15-2), which became effective October 1, 2015, a conviction of possession of narcotics under § 21a-279 (a) is a misdemeanor and no longer is a felony. Therefore, according to the defendant, his prior convictions under that statute could not be the basis for a finding that he is a persistent *felony* offender. In denying the defendant's motion to dismiss, the trial court relied on this court's decision in *State* v. *Moore*, 180 Conn. App. 116, 124, 182 A.3d 696, cert. denied, 329 Conn. 905, 185 A.3d 595 (2018), in which we held that P.A. 15-2 does not apply

retroactively and which this court followed in *State* v. *Bischoff*, 189 Conn. App. 119, 122–23, 206 A.3d 253 (2019), aff'd, Conn. , A.3d (2021). During the pendency of the appeal in the present case, our Supreme Court issued its decision in *State* v. *Bischoff*, Conn. , A.3d (2021), affirming this court's judgment that P.A. 15-2 does not apply retroactively. At oral argument before this court, the defendant's appellate counsel acknowledged that we are bound by our Supreme Court's decision in *Bischoff* and that the defendant's claim concerning his conviction as a persistent felony offender no longer is viable. Therefore, counsel withdrew the issue from consideration on appeal. Accordingly, we do not address this claim.

[2] The victim testified that, on the previous day, Saturday, January 27, 2018, he withdrew $800 from the bank to pay his rent. He explained that he withdrew the money in 100 and 50 dollar bills, so that he would not waste it.

[3] Regarding the watch, the victim testified on direct examination that he "had no idea what [the defendant and Moniz] were talking about . . . ." Moniz testified regarding this issue, stating that, about two weeks prior to the incident at issue here, he had the victim over to his apartment, where they had been drinking. A watch and chain belonging to Moniz were on a living room table, and, according to Moniz, the victim was the only one at his house at the time. When Moniz had his back turned to the victim, the victim said he was leaving. After the victim left, Moniz noticed that the watch was not there anymore. At the defendant's apartment on January 29, 2018, Moniz confronted the victim about the watch, asking him where it was and if he took it. Moniz testified that the victim denied stealing the watch but, nevertheless, offered to give him money for it. Moniz testified further that the victim told him he would give him $300 for the watch, that the money was at the victim's apartment, and that they finished another drink before heading to the victim's apartment to get the money.

[4] The record shows that the victim was found to be in violation of his probation on October 20, 2017, and that he admitted the violation and was resentenced on January 8, 2018, which was approximately three weeks prior to the incident at issue in this case. Defense counsel also sought to inquire about the fact that the victim had been arrested, twice, while on probation. The court declined the request, stating that "an arrest is not a conviction. Anybody can be arrested." The defendant does not challenge in this appeal the court's ruling prohibiting questions about the two arrests.

[5] In his appellate brief, the defendant also claims that the court's exclusion of the proffered line of questioning violated his constitutional right to present a defense. For the same reason we have rejected the defendant's claimed violation of his constitutional right to confrontation, we reject this claim as well. See *State* v. *Saucier*, 90 Conn. App. 132, 142–43, 876 A.2d 572 (2005) ("The defendant's constitutional claim that he was prohibited from presenting a defense by the court's exclusion of the proffered evidence first required him to show that the exclusion was improper. . . . Because we conclude that the court did not abuse its discretion in excluding the proffered evidence [as speculative and irrelevant], it follows that the defendant's constitutional right to present a defense was not violated." (Citation omitted.)), aff'd, 283 Conn. 207, 926 A.2d 633 (2007).

[6] The state's written request to charge included jury instructions regarding the police investigation, assault in the second degree as it relates to the element of serious physical injury, consciousness of guilt and exhibits that contained partial redactions. The state's supplemental written request to charge included a charge on accessory liability.

[7] The defendant's written request to charge included jury instructions concerning reasonable doubt, the credibility of witnesses, impeachment evidence, the prior inconsistent statements of the victim and Moniz, and a specific unanimity charge. In his request to charge, the defendant also objected to the state's request to charge on assault in the second degree as it relates to the element of serious physical injury, as well as the state's requests to charge as to the police investigation and consciousness of guilt.

[8] Pursuant to *Golding*, as modified by *In re Yasiel R.*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim

will fail. . . . *State* v. *Golding*, supra, 213 Conn. 239–40." (Emphasis in original; internal quotation marks omitted.) *State* v. *Coleman*, 199 Conn. App. 172, 186 n.8, 235 A.3d 655, cert. denied, 335 Conn. 966, 240 A.3d 281 (2020).

[9] We note that the state raised and briefed its *Kitchens* claim in its appellate brief. Although the defendant filed a motion for an extension of time to file a reply brief, which was granted, no reply brief was filed, nor did the defendant's principal brief address the *Kitchens* waiver issue. The defendant's appellate counsel, nevertheless, filed the letter of supplemental authority pursuant to Practice Book § 67-10 related to this issue, and the state never objected. At oral argument before this court, the defendant's appellate counsel and the state addressed the supplemental authority and the state's assertion that the defendant's claim of instructional error was waived. Accordingly, although claims must be adequately briefed and, normally, we do not address claims raised for the first time at oral argument; *Bridgeport* v. *Grace Building, LLC*, 181 Conn. App. 280, 294, 186 A.3d 754 (2018); given the defendant's letter pursuant to § 67-10 and the absence of an objection by the state, under the circumstances here, we will consider the defendant's claim concerning *Brown* and *Ruocco*.

[10] In *Griffin*, for example, the United States Supreme Court explained: "[T]he term 'legal error' means a mistake about the law, as opposed to a mistake concerning the weight or the factual import of the evidence. . . . Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the [c]onstitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence . . . . 'It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.' " (Citation omitted; emphasis in original.) *Griffin* v. *United States*, supra, 502 U.S. 59–60.

––––––––––––––––––